UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN RE APPLICATION OF USA PURSUANT TO 18 U.S.C. 3512 FOR SEARCH OF INFORMATION ASSOCIATED WITH ONE FACEBOOK PROFILE STORED AT PREMISES CONTROLLED BY FACEBOOK INC.** | ML No. _____ |

*Reference: DOJ Ref. # CRM-182-58237; Subject Account:* **100006156197762**

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, Cynthia Kayle, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook profile ("the account") that is stored at premises owned, maintained, controlled, or operated by Facebook, Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A), and 3512(a), to require Facebook to disclose to the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B, using the procedures described in Section III of Attachment B.

2. The information requested in this search warrant is being sought pursuant to a request for assistance ("the request") from the Federal Office of Justice of the Federal Republic

of Germany ("Germany") transmitted to the United States Department of Justice dated January 17, 2018. Authorities in Germany are investigating terrorism and war crimes offenses in violation of the criminal laws of Germany, specifically, sections 52, 53, 129a, 129b, and 211 of the German Criminal Code and section 8 of the German Code of Crimes against International Law. Copies of the applicable laws are appended to this affidavit.

3.      The request is made pursuant to the Treaty Between the United States of America and the Federal Republic of Germany on Mutual Legal Assistance in Criminal Matters, U.S.-F.R.G., Oct. 14, 2003, S. TREATY DOC. NO. 108-27 (2004), as supplemented by the Supplementary Treaty to the Treaty Between the United States of America and the Federal Republic of Germany on Mutual Legal Assistance in Criminal Matters, F.R.G.-U.S., April 18, 2006, S. TREATY DOC. NO. 109-13 (2006) (hereinafter, the "Treaty"). Under the Treaty, the United States is obligated to render assistance in response to this Request.

4.      I am a Special Agent with the Federal Bureau of Investigation, and have been so employed since 2005. I am currently assigned to the International Operations Division, Mutual Legal Assistance Treaty Unit. My current duties include responding to requests from foreign governments pursuant to Mutual Legal Assistance Treaties, including serving as the affiant on search warrant affidavits, serving search warrants, and reviewing the data received for relevance in compliance with the parameters of the search warrants.

5.      Prior to my assignment in the International Operations Division, I was assigned to the Los Angeles Division, Orange County Resident Agency, as a member of the Child Exploitation Task Force ("CETF"). The CETF is responsible for investigating federal criminal statutes in the Central District of California involving the sexual exploitation of children under 18 U.S.C. §§ 2251 *et seq.* In addition, I have participated in numerous investigations including,

but not limited to, the investigations of crimes against children, violent crimes, cybercrimes, white collar crimes, and national security investigations.

6. The facts set forth in this affidavit are based upon information conveyed to the United States via the request made pursuant to the Treaty by authorities in Germany and upon my training and experience. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of the criminal laws of Germany have been committed by Abdul Jawad Al Khalaf ("Al Khalaf"). There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, contraband or fruits of these crimes further described in Attachment B.

## JURISDICTION

8. This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. *See* 18 U.S.C. § 2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court "is acting on a request for foreign assistance pursuant to [18 U.S.C.] section 3512 . . . ." 18 U.S.C. § 2711(3)(A)(iii); *see also* 18 U.S.C. § 3512(a)(2)(B) (court may issue "a warrant or order for contents of stored wire or electronic communications or for records related thereto, as provided under section 2703"), § 3512(c)(3) ("application for execution of a request from a foreign authority under this section may be filed . . . in the District of Columbia").

9. This application to execute the Request has been approved and duly authorized by an appropriate official of the Department of Justice, through the Office of International Affairs

("OIA").[1] *See* 18 U.S.C. § 3512(a). An OIA attorney has reviewed the request, confirmed that it was submitted by authorities in Germany in connection with a criminal prosecution, and authorized the undersigned to file this application.

## PROBABLE CAUSE

10. Authorities in Germany are prosecuting Al Khalaf and others for their role in the execution of thirty-six prisoners in Syria in or around March 2013. The German investigation of Al Khalaf first began in February 2016, when Saleh Alghadban ("Alghadban") turned himself in to French police and confessed to being an Islamic State of Iraq and Syria ("ISIS") terrorist. Specifically, Alghadban claimed to be in charge of a terrorist cell tasked with carrying out an attack in Düsseldorf and named Al Khalaf as one of his accomplices. According to Alghadban, while in Syria, Al Khalaf had led his own combat unit in Syria named "Katiba Mohamed Ibn Abd Allah" ("Katiba"), which was a subunit of the foreign terrorist organization Jabhat al-Nusra ("the Nusra Front").

11. Separately, an individual named Alhaz sought asylum in Germany. On August 30, 2016, during his asylum hearing, Alhaz identified himself as a member of Al Khalaf's combat unit named Katiba. Alhaz detailed the structure, finances, armament, and activities of Katiba Mohamed Ibn Abd Allah, identified former members of this unit, and gave an account of his own actions for Katiba, for which he was arrested on December 20, 2016. Alhaz further noted that Al Khalaf was frequently referred to by his battle name "Abu Jandal."

---

[1] The Attorney General, through regulations and Department of Justice directives, has delegated to the Office of International Affairs the authority to serve as the "Central Authority" under treaties and executive agreements between the United States and other countries pertaining to mutual assistance in criminal matters. *See* 28 C.F.R. §§ 0.64-1, 0.64-4, and Appendix to Subpart K, Directive Nos. 81B and 81C (2018).

4

12.     German authorities subsequently questioned a number of close acquaintances of Al Khalaf. One of those acquaintances led German authorities to a witness then residing in the Netherlands and whose identity is being kept secret ("Witness 1"). The acquaintance reported that he and Al Khalaf had visited Witness 1 in 2014 because the visit was important to Al Khalaf. As part of their investigation into Al Khalaf's ties to ISIS and the Nusra Front, German authorities submitted a letter rogatory to Dutch authorities seeking assistance in locating and interviewing Witness 1. With the assistance of Dutch authorities, German authorities interviewed Witness 1 on February 9, 2017. During this interview, Witness 1 provided authorities with a detailed account of a mass execution in which Al Khalaf allegedly took part in Syria in March 2013. Based on this information, German authorities shifted the focus of their investigation to Al Khalaf's role in murder and war crimes offenses.

### *The 2013 Mass Execution*

13.     The events described below are mainly based on testimony from the cooperating defendant Alhaz and Witness 1 as well as publicly available videos connected to the event.

14.     In March 2013, Al Khalaf's Katiba combat unit had formed a temporary alliance with two other combat units, and together these allied units took part in the capture of the governor's palace in Raqqa, Syria. Following the Raqqa attack, the Nusra Front forces captured Syrian government employees, including police officers, security staff, border guards, and members of the army and militiamen. Thirty-six of these prisoners were handed over to Al Khalaf's combat unit and its allies.

15.     At the time of the attack, Witness 1 was serving as the head of the media department in the nearby Syrian town of Tabqa. Witness 1 recalled to authorities that in March or April 2013, an unidentified individual contacted Witness 1 at around 5:00 a.m. and demanded

that Witness 1 come film something. Witness 1 was taken to a garbage dump outside of town where he saw a group of people gagged and guarded by armed fighters. Although he was ordered to film their execution, Witness 1 refused to do so. However, because he had been driven to the site, he was unable to leave. Consequently, Witness 1 subsequently bore witness to the executions of the prisoners held by Al Khalaf's combat unit. Witness 1 described how the prisoners were first taken before a Nusra Front Sharia judge named "Abu Turaba" who was responsible for the Tabqa area; Abu Turaba ordered that the prisoners be executed. The prisoners were then taken in groups of five or six to a natural hollow where they were executed. Abu Turaba personally killed the first captive with a stone. Witness 1 testified that Al Khalaf, also known to Witness 1 as Abu Jandal, then encouraged his fighters to kill the other prisoners, which they did using automatic rifles, pistols, and knives. According to Witness 1, Al Khalaf personally killed several prisoners using all three types of weapons.

16. German authorities subsequently located a video on YouTube entitled "36 Regime Prisoners in the Governor's Palace in Al-Raqqa 7-3-2013." The video bears a time stamp of March 7, 2013. In the video, an armed man reports that thirty-six prisoners were taken from the governor's palace in Raqqa by combat forces including the "Katiba Mohamed Ibn Abd Allah under the command of Sheikh Abu Jandal." Witness 1, Alhaz, Al Khalaf's former roommates, and one of Al Khalaf's brothers each confirmed that Abu Jandal is Al Khalaf's battle name. The video then shows thirty-six men grouped together on their knees.

17. German authorities subsequently indicted Al Khalaf and others for their roles in this event and have commenced their criminal trial, which is anticipated to last until the fall of 2018. So far, Witness 1 has provided four full days of testimony before the Stuttgart Higher Regional Court, in which he confirmed his initial statement in almost every detail and provided

further information. When shown the video in court, Witness 1 was able to identify some of the prisoners shown on the video as those that he had seen killed

### *Facebook Evidence of the March 2013 Killings*

18.     At trial, Witness 1 also testified to a Facebook exchange he had with Al Khalaf in which Al Khalaf allegedly admitted to his role in the killing of the prisoners. Specifically, after moving to the Netherlands, Witness 1 used a Facebook profile associated with user-ID **100006156197762**. Witness 1 testified that between approximately September and October of 2014, he had exchanged Facebook messages with Al Khalaf regarding the March 2013 slaughter of prisoners. According to Witness 1, during this exchange, Al Khalaf admitted to participating in the execution. Shortly after this conversation, in late October 2014, Witness 1 testified that Al Khalaf visited him. At that time, Al Khalaf demanded that Witness 1 delete the Facebook communications and threatened that if Witness 1 did not delete the messages, Al Khalaf would seek revenge on Witness 1 and his family. This testimony was partially corroborated by the acquaintance who had first led German authorities to Witness 1. That acquaintance confirmed to authorities that he had traveled with Al Khalaf to visit Witness 1 in late October 2014.

19.     Sometime not long after the Facebook exchange with Al Khalaf, Witness 1 stopped using his Facebook account. When Witness 1 attempted to provide authorities access to his Facebook account in 2017, Witness 1 and authorities learned that Facebook had blocked the account. Consequently, neither Witness 1 nor authorities have been able to access the records, for which Facebook requires legal process.

20.     German authorities are now seeking content records for the Facebook profile **100006156197762** to corroborate Witness 1's testimony and establish Al Khalaf's confession to his involvement in murder and war crimes.

## **BACKGROUND CONCERNING FACEBOOK**

1. Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com. The website was launched on February 4, 2004 and is owned and operated by Facebook, Inc. Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

2. Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter. This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers (for password retrieval), physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers. Facebook also assigns a user identification number to each account. Facebook identifies unique Facebook accounts by a user's e-mail address, the user-identification number, or the username associated with a Facebook profile.

3. Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group. A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request." If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other. Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

4.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts. By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users. A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings. Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

5.     Facebook users can create profiles that include photographs, lists of personal interests, and other information. Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet. Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list. In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times. A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

6.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video. It also provides users the ability to "tag" (*i.e.*, label) other Facebook users in a photo or video. When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video. For Facebook's purposes, the photos and videos associated with

9

a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

7. Facebook users can exchange private messages on Facebook with other users. Those messages are stored by Facebook unless deleted by the user. Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile. In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger. These chat communications are stored in the chat history for the account. Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

8. If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

9. Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages. Facebook users can "like" Facebook posts or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites. Facebook users can also become "fans" of particular Facebook pages.

10. Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

11. Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

12. Facebook also has a Marketplace feature, which allows users to post free classified ads. Users can post items for sale, housing, jobs, and other items on the Marketplace.

13. In addition to the applications described above, Facebook also provides its users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

14. Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address. These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action. For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

15. Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

16. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal

conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, Facebook builds geo-location into some of its services. Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other. This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

17. Therefore, the computers of Facebook are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## CONCLUSION

18. Based on the forgoing, I request that the Court issue the proposed search warrant.

19. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

20. Because the warrant will be served on Facebook, Inc. who will then compile the requested records and information at a time convenient to it, there exists reasonable cause to permit the execution of the requested warrant at any time in the day or night.

Respectfully submitted,

_____
Cynthia Kayle
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on _____, 201__

_____
UNITED STATES MAGISTRATE JUDGE

## Relevant Provisions of Germany's Criminal Code

**Section 129a - Forming terrorist organizations**
(1)     Whoever forms an organization, the objectives or activity of which are directed towards the commission of:
        1. murder with aggravating circumstances (Section 211) or manslaughter (Section 212) . . . or war crimes (Section 8 . . . of the Code of Crimes against International Law)
        2. [. . .] or whoever participates in such a group as a member
shall be punished with imprisonment from one year to ten years.
(2-9)   [. . .]

**Section 129b - Criminal and terrorist organizations abroad; extended confiscation and deprivation**
(1)     Section 129 and section 129a shall apply to organizations abroad. If the offence relates to an organization outside the member states of the European Union, this shall not apply unless the offence was committed by way of an activity exercised within the Federal Republic of Germany or if the offender or the victim is a German or is found within Germany. In cases which fall under the 2nd sentence above, the offence shall only be prosecuted on authorization by the Federal Ministry of Justice. Authorization may be granted for an individual case or in general for the prosecution of future offences relating to a specific organization. [. . .]
(2)     [. . .]

**Section 211 - Murder with aggravating circumstances**
(1)     The murderer shall be punished with imprisonment for life.
(2)     A murderer is whoever kills a human being out of murderous lust, to satisfy his sexual desires, from greed or otherwise base motives, treacherously or cruelly or with means dangerous to the public or in order to make another crime possible or cover it up.

**Section 52 - Act Constituting More than One Violation**
(1)     If the same act violates more than one penal norm or the same penal norm repeatedly, then only one punishment shall be imposed.
(2)     If more than one penal norm has been violated, then the punishment shall be determined according to the norm that provides for the most severe punishment. It may not be more lenient that the other applicable norms permit.
(3-4)   [. . .]

**Section 53 - Commission of More than One Violation -**
(1)     If someone has committed more than one crime, as to which judgment will be simultaneously rendered, and incurred more than one term of imprisonment or more than one fine, an aggregate punishment shall be imposed.
(2-3)   [. . .]

## Relevant Provisions of Germany's Code of Crimes against International Law

**Section 8 - War crimes against persons**
(1) Whoever in connection with an international armed conflict or with an armed conflict not of an international character:
  1. kills a person who is to be protected under international humanitarian law,
  2-6. [. . .]
  7. imposes on, or executes a substantial sentence in respect of a person who is to be protected under international humanitarian law, in particular the death penalty or imprisonment, without that person having been sentenced in a fair and regular trial affording the legal guarantees required by international law,
  8-9. [. . .] shall be punished, in the cases referred to under number 1, with imprisonment for life, . . . in the cases referred to under 6 to 8, with imprisonment for not less than two years.
(2-5) [. . .]
(6) Persons who are to be protected under international humanitarian law shall be:
  1-2. [. . .]
  3. in an international armed conflict and in an armed conflict not of an international character: members of armed forces and combatants of the adverse party, both of whom have laid down their arms or have no other means of defense

2